**AFFIRM; and Opinion Filed August 10, 2015.**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

No. 05-13-01553-CR
No. 05-13-01554-CR

**JOHN MICHAEL JONES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 3**
**Dallas County, Texas**
**Trial Court Cause Nos. F12-62863-J & F13-00350-J**

## MEMORANDUM OPINION

Before Justices Bridges, Fillmore, and Brown
Opinion by Justice Brown

John Michael Jones appeals his two convictions for aggravated robbery with a deadly weapon during a drug deal that left Jerrold Morris (Morris) and Robert Tharps dead and Tristan Cherry injured. After finding appellant guilty in each case, the jury set punishment at twenty and twenty-five years' confinement. In five issues, appellant claims the evidence is insufficient to support his convictions, the trial court erred by denying his motion to quash the indictment, and the trial court abused its discretion by limiting his time to conduct voir dire and allowing a State's expert witness to testify. We affirm.

### BACKGROUND

Appellant was charged with capital murder in the death of Morris or Tharps, committed in the course of a conspiracy with his brother, Morris Jones (Jones), or Alton Beasley to rob Morris or Tharps. The jury acquitted appellant of capital murder but found him guilty of the

lesser included offense of the aggravated robbery of Morris or Tharps, acting as a party with Beasley. Appellant was also charged and convicted of the aggravated robbery of Cherry, acting as a party with Beasley in the commission of the offense. In both charges, the jury was instructed on the law of parties and accomplice witness testimony.

The State's theory at trial was that Cherry and his brother, Tharps, drove from Oklahoma to meet Morris in Dallas to buy two kilos of cocaine. They were put in contact with Jones via an intermediary, Jason Pogue, known as J.P. and "Tony Paper." Although Jones told J.P. that his brother, appellant, had the cocaine or could get it, the State argued Jones and appellant never intended to sell the three men any drugs; rather, the brothers planned to "hit a lick" or rob the buyers of the nearly $53,000 cash they had. In order to do so, appellant spoke and texted with Alton Beasley, a seventeen-year-old "friend," who he asked to commit the robbery. Appellant told Beasley that if things went wrong, Beasley was to "pop" them but he was not to harm J.P. Jones gave J.P. the address where the buyers were to pick up the drugs and, when they arrived, Beasley was waiting. He let everyone in the house, then bolted the door shut. When one of the buyers asked to see the drugs, Beasley walked in the kitchen and came out shooting. He killed Tharps and Morris and injured Cherry.

In contrast, appellant argued this was simply a drug deal gone wrong. According to appellant, he and his brother put together the drug deal but did not intend for it to be a robbery. In fact, appellant claims nothing tends to connect him to the robbery or to show he was aiding, assisting, or encouraging Beasley to commit a robbery.

In support of its theory of the case, the State presented nineteen witnesses and over 360 exhibits over a nine-day period. Cherry, who was eight years older than his brother, testified he and Tharps had known Morris since elementary school. The two brothers drove from Oklahoma to Dallas and met Morris at his shop on West Illinois Avenue around eleven in the morning.

After they arrived, it appeared that Tharps's "regular" Dallas contact for drugs fell through and "they had to start calling somebody else," doing "something different from what they were expecting to do." Sometime after lunch, J.P. showed up. According to Cherry, J.P. did not make a good impression; he did not "look like the [right] guy if you're trying to score what they're trying to score" which was two kilos of cocaine.

J.P. and Morris talked and, according to Cherry, J.P. was "gonna call Sleep . . . or somebody like that." "Sleep" was later identified as Jones. J.P. said they could get one kilo but the second one was harder to get. After several calls, J.P. said they got an "SA" or "Mexican" who would get the second kilo for them. He put his phone on speaker, and the caller asked "is the paperwork in order" which Cherry assumed was his way of asking if Tharps and Morris had the money for the two kilos. Even though the caller was told the money was there, he called back several times and repeatedly asked if the "paperwork" was in order; this made Cherry suspicious. After several hours, Cherry and the others were told "Sleepy's little brother" would meet them at a house with the drugs. All four men got in Morris's Range Rover and started driving. When Cherry asked where they were going, he was told they were waiting on a phone call with an address. The call came, and J.P. was given the address of 307 Annarose Drive.

Morris drove the Range Rover to Annarose and pulled up on the street parallel to the house. He and J.P. got out, went to the door, and looked inside. They returned to the car and said everything was fine. Morris pulled in the driveway. He and Tharps got out but left the vehicle running. After entering the house, Tharps returned to the front door and motioned to Cherry and J.P. to come inside. Cherry saw a young man, later identified as Beasley, holding a gun and standing behind Tharps. Cherry told J.P. to turn off the car, and the two went in the house.

Inside, the house was dark. Because Tharps and Morris were already sitting down, Cherry sat down on the sofa. Beasley, who had a "hands free" device attached to his ear, walked to the front door and secured it with a two-by-four. Cherry assumed he was talking to someone because the device was blinking. Beasley walked briefly into the kitchen, walked out, and began shooting. He shot Tharps twice, then shot at the sofa, hitting Cherry in the foot. J.P. ran to the door, removed the two-by-four, and ran out. Beasley shot Cherry in the thigh and asked, "[W]here's the money?" He shot Cherry three more times before Cherry kicked the gun from Beasley's hand and into Morris's lap. Morris and Beasley then began fighting over the gun. Because of his injuries, Cherry could not walk so he crawled to the door, rolled down the steps, and hid in the bushes on the side of the house. He heard a car door slam, and when he looked, he saw a blue Cadillac "SUV−type" vehicle with dark tinted windows driving away.

Police arrived a short time later. Initially, they thought Cherry was the shooter but they soon realized he had been shot and was seriously injured. In fact, when Beasley shot Cherry in the arm, it snapped his ulna. The shot to his foot broke three toes, and the shot to his thigh broke his femur. Another shot hit his stomach, sending shrapnel into his pelvis and back. Despite these injuries, Cherry was able to talk to police at the hospital and identified Beasley from a photograph as the shooter.

J.P. told the jury that he and Morris were good friends. When Morris contacted him about buying two kilos of cocaine, J.P. texted Jones, who was also known as "Sleep" or "Big Shot," to see if he had access to that quantity of cocaine. Jones said his brother, appellant, had it or could get it. On June 3, J.P. went to Morris's office and met with Morris, Tharps, and Cherry. While J.P. was there, Jones texted J.P. "everything in motion, waiting on SA with the other one." When Jones later texted J.P. and asked "[h]ow much u tellm" for the cocaine, J.P. replied "53" meaning $53,000; J.P. explained that he and Jones were each to get $1000, appellant would get

$48,000 because he was supplying the drugs, and Morris, also known as "Big Homie," would get $3000. Jones texted back, asking if J.P. saw the "paper W" meaning the money, and J.P. responded he had. Jones referred to "bro" throughout the texting, which J.P. assumed meant Jones's brother, appellant. Because the deal was taking longer than normal, J.P. assured the others that Jones was "my everyday dude," telling them he did not think Jones would "try to cross me."

Finally, Jones called and gave the address where the drugs were being delivered. Although he initially said appellant would be there, Jones later said the "SA" was going to have his worker there to do the deal. When the four men arrived at the house, J.P. got out and knocked on the door. A voice told him to drive around back. He got back in the Range Rover but before they went anywhere, Beasley opened the door and flagged them into the driveway. Morris parked but left the car running, and he and Tharps went inside. When Beasley waved at J.P. and Cherry to come in, J.P. turned off the car, and the two men went in the house. Beasley, who secured the door with a two-by-four bolt, was on the phone with somebody and asked if they had the money. J.P. responded, "Hell yeah, we got the money. Where the dope at?" Beasley told the person he was talking to "they wanna know where the stuff at," and walked into the kitchen. J.P. thought about telling Morris to get his gun out because something "just didn't feel too right," but he did not. When Beasley came out, he "went off . . . [and] started shooting." J.P. dove behind the refrigerator, losing his cell phone and eyeglasses. Although he could not see well, he saw Cherry heading toward the front door, so J.P. removed the two-by-four, opened the door, and ran out. He went to a nearby store and tried to call Jones but it went straight to voice mail. He finally contacted a family member to come get him. Using someone else's phone, J.P. called Jones and told him to come over; Jones drove to J.P.'s brother's house in a blue Cadillac

CTS. During their conversation, J.P. accused Jones of trying to have him killed, but Jones denied it.

Beasley testified that appellant called him on June 2 and "said he got a play for out-of-town people" from Oklahoma. Beasley explained that "a play" meant a robbery. The following day, appellant picked Beasley up in his white Chevy Malibu to drive him to the house on Annarose. The two men discussed how to pull off the robbery; appellant suggested they use fake drugs, but Beasley disagreed. On the way to Annarose, they stopped at a gas station where appellant called J.P.; Beasley took the phone from appellant and asked J.P. if the money was good and whether everything was ready. Beasley checked his gun and decided he needed a different one. They detoured to another location where appellant got a .45-caliber gun which he gave to Beasley, telling him "If anything goes wrong, pop 'em." Beasley said he understood that meant he should shoot the men, but appellant specifically told Beasley "don't mess with [J.P.], because he's a partner." Beasley said the money was going to be split evenly between appellant, Jones, and Beasley, and that appellant would "look out" for J.P., meaning he would give him something. Appellant left, and Beasley went in the house and waited.

When the buyers arrived, Beasley told them to pull in the driveway. At first, only three people walked in, and Beasley told them to get the fourth person inside. Beasley was on the phone with appellant, telling him the money was good when someone asked where the drugs were. Beasley walked in the kitchen as though he was going for the drugs, but when he came out, he began shooting, first to the right side, then to the left. He got in "a tussle" over the gun with one of the victims and drew his own gun but inadvertently shot himself. Beasley looked around the house for the money but could not find it. He went out front and looked in the Range Rover, opening two of the doors but still could not find the money. He saw appellant driving down the street and got in the car. Seeing Beasley was bleeding, appellant asked what happened

and Beasley said, "Shit went wrong." Appellant asked if he got the money, and Beasley said no. Appellant then said he had to get the money, but Beasley told him just to drive off which they did. Beasley returned the .45-caliber gun to appellant. Later, when he got back to his apartment, Beasley realized he had lost his cell phone. Although he claimed he did not "know that [anyone] was gon' die," he subsequently admitted he was trying to kill them and "[n]obody was gonna be spared."

In addition to this testimony, the State presented forensic, DNA, and cell phone evidence. The house was known as a drug house, and the windows were boarded up allowing limited access from the outside. The front door had a two-by-four lock set up which could be controlled by anyone inside. A neighbor, Rodney Tatum, said he was home that day and heard the sound of a car. When he looked out of his window, he saw a white Chevy Malibu parked in the back yard with someone inside. A heavyset black male in a white t-shirt was leaning against the door of the drug house.

Detective Kevin Moss of the Crime Scene division helped process the scene. Police recovered a 9-millimeter pistol near Morris's body and a .45-caliber pistol by Tharps's body, each with the safety on. In addition, police found seven cell phones, a pair of eyeglasses, eight .45 shell casings, a bag containing $51,285 in cash under Morris's body, keys, a wallet belonging to Tharps, and a box of .40 caliber hollow point shells. Forensic firearm expert Susan Allen said all eight .45 cartridge cases found at the house were fired from the same gun although it was not the .45 caliber pistol recovered by Tharps's body. She analyzed the bullets taken from Morris's body and confirmed they were fired by the gun that fired the eight cartridges recovered at the scene.

Forensic fingerprint expert Peter Salicco said he analyzed four sets of prints lifted from the Annarose crime scene. He identified the prints from a pair of eyeglasses found behind a

–7–

chair in the living room and from the exterior front passenger door of the Range Rover as belonging to J.P. Two prints found on the back exterior right passenger side belonged to Beasley. Blood found in appellant's white Chevy Malibu matched Beasley's DNA profile.

Cell phone records for Jones, J.P., appellant, and Beasley were introduced, and Randall Thompson, custodian of the records, interpreted the data. Each record showed the originating phone number, the subscriber name, the destination phone number, whether the call was answered, the duration of the call, and whether a three-way call was placed. Cell tower data allowed Thompson to determine the approximate location of each originating call at any given time. This provided police with a visual mapping of the phone conversations, both verbal and textual, between appellant, J.P., Jones, and Beasley on the day of the shooting, as well as a general physical location of each phone user. The cell tower records confirmed Morris, Tharps, Cherry, and J.P. were at 2250 West Illinois and later moved to the area of 307 Annarose. They also confirmed that appellant was in the area of his home, moved to the area near Beasley's apartment, and then moved to the area near 307 Annarose just before the shootings.

Dale Lundberg, senior corporal of Dallas Police Homicide Unit at the time of the offenses, spoke with Cherry who told him about J.P., "Sleep," and Sleep's brother. Cherry said J.P. made a "flurry of calls" to the man known as Sleep during the afternoon. Lundberg then interviewed J.P., who confirmed Sleep was Jones and that he was talking or texting with Jones during the afternoon of the shooting, including at least one call right before the shooting. Lundberg reviewed J.P.'s phone records which confirmed the many calls between J.P. and Jones. On the day of the shooting, Jones texted J.P. that "The $$ gon come bcz we got a great gameplan" and later asked if the buyers had the money, how much money was involved, and whether J.P. had actually seen the money. Jones also texted the 307 Annarose address to J.P.

Police identified one of the seven cell phones found at the crime scene as belonging to J.P.; the cell records show that after the shooting, J.P. did not make any calls on that phone.

Lundberg interviewed appellant, and examined his phone records and text messages as well. Appellant made numerous calls to Beasley and Jones on the day of the shooting. The records showed appellant and Beasley were in the same cell phone tower area at 4:26 but that they had no phone contact from 4:26 until about 5:00; Lundberg believed this confirmed Beasley's statement that appellant picked him up and dropped him off at 307 Annarose. Lundberg then obtained the phone records for Jones's phone number and examined the series of calls and texts made just before the time of the murders. In particular, Lundberg saw a text with "307 Annarose" sent shortly before the shooting from appellant's cell phone to Jones's phone. Phone records showed Jones was on the phone with J.P. when the text was sent. At 4:56, appellant texted his brother to ask "what Tony Paper got on." Jones responded he did not know, but then gave a physical description of J.P., including that he wore glasses. About a minute later, Jones texted "gon have a hat on think Lacoste shirt" and "make sure he don't fuck witm bro." Appellant texted back, "I gotcha, he ain't gon touch him."

Although the jury was instructed on capital murder, the charge also alleged Beasley, intentionally, knowingly, or recklessly, caused bodily injury to Morris or Tharps by shooting either man with a firearm while in the course of committing theft of property and with intent to obtain or maintain control of said property while using or exhibiting a deadly weapon and that appellant acted with intent to promote or assist the commission of the aggravated robbery of Morris or Tharps by encouraging, soliciting, directing, aiding, or attempting to aid Beasley in the commission of the aggravated robbery. The jury charge included an instruction on law of the parties and on accomplice witness testimony. The jury acquitted appellant of capital murder and found him guilty of the lesser included offense of aggravated robbery of Morris or Tharps, acting

–9–

as a party with Beasley. The jury also found him guilty of the aggravated robbery of Cherry, acting as a party with Beasley in the commission of the offense.

## SUFFICIENCY OF THE EVIDENCE

In his first and second issues, appellant claims the evidence is legally insufficient to support his convictions. Specifically, he argues there is no evidence to corroborate the accomplice witness testimony and, therefore, the State failed to prove appellant acted as a party during the commission of the offenses.

When reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the jury's verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014). When analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An inference is "a conclusion reached by considering other facts and deducing a logical consequence from them." *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). Direct and circumstantial evidence are treated equally. *Clayton*, 235 S.W.3d at 778.

A person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of property, he intentionally, knowingly, or recklessly causes bodily injury to another. TEX. PENAL CODE ANN. § 29.02 (West 2011). A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property; appropriation of property is unlawful if it is without the owner's effective consent. *Id*. § 31.03(a), (b)(1) (West

–10–

Supp. 2014). A person commits aggravated robbery if he causes serious bodily injury to another or uses or exhibits a deadly weapon during the course of robbery. *Id*. § 29.03(a).

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. *Id*. § 7.01(a). A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2); *see Patterson v. State*, 950 S.W.2d 196, 202 (Tex. App.—Dallas 1997, pet. ref'd). The evidence must show that, at the time of the offense, the parties were acting together, each performing some role in the execution of the common purpose. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996) (op. on reh'g); *Burdine v. State*, 719 S.W.2d 309, 315 (Tex. Crim. App. 1986); *Patterson*, 950 S.W.2d at 202.

When determining whether appellant participated as a party, we may look to events occurring before, during, and after the commission of the offense, and may rely on appellant's actions which show an understanding and common design to do the prohibited act. *King v. State*, 29 S.W.3d 556, 564 (Tex. Crim. App. 2000); *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985). To support a conviction based on the testimony of an accomplice, there must be corroborating evidence that tends to connect appellant with the offense. *See* TEX. CODE CRIM. PROC. ANN. 38.14 (West 2005). Corroboration is not sufficient if it merely shows the offense was committed. *Id*. In making our review, we eliminate all of the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect appellant with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). The corroborating evidence need not be sufficient by itself to establish guilt. *Id*. It may confirm a "mere detail" rather than the elements of the

–11–

offense. *Lee v. State,* 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). We look at the particular facts and circumstances of each case and consider the combined force of all the nonaccomplice evidence that tends to connect appellant to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). The "tends to connect" standard is not a high threshold. *Randall v. State,* 218 S.W.3d 884, 886 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Cantelon v. State*, 85 S.W.3d 457, 461 (Tex. App.—Austin 2002, no pet.).

We first address appellant's complaint that the evidence is insufficient to support his convictions because there is no corroboration of Beasley's testimony. When making our review, we eliminate all of Beasley's testimony and then examine the remaining portions of the record to see if there is any evidence that tends to connect appellant with the commission of the offenses. *See Castillo*, 221 S.W.3d at 691. The record shows the following corroboration evidence was adduced at trial.

When Tharps's regular contact did not come through, Morris contacted someone about buying two kilos of cocaine. In response, J.P. showed up at Morris's office and contacted Jones who said his brother could get the first kilo but they would have to contact someone else for the second kilo. J.P. texted and spoke with Jones throughout the afternoon. Appellant was also texting and speaking with Jones during that same time frame. Jones told J.P. that appellant would meet them at the house to do the deal, giving him the 307 Annarose address. Jones then called back and said appellant would not be there but the SA's associate would be. A neighbor saw a car matching the description of appellant's white Chevy Malibu directly behind 307 Annarose before the shooting. Appellant and Jones texted about what J.P. was wearing, and Jones cautioned appellant to make sure J.P. was not injured. Appellant replied "he aint gon touch him." According to J.P. and Cherry, when they showed up at 307 Annarose, Beasley was waiting. He made sure everyone was in the house, then barricaded the door. Beasley had a

–12–

wireless device in his ear and appeared to be talking to someone. When the buyers wanted to know where the drugs were, Beasley walked in the kitchen as though he was getting the drugs. When he came out, he started shooting, killing Tharps and Morris and seriously injuring Cherry. After the shooting, appellant was driving down Annarose Drive and picked up Beasley, who was bleeding, and drove him home. Having reviewed the non-accomplice testimony regarding circumstances before, during, and after the shootings and the physical evidence, we conclude the non-accomplice evidence tends to connect appellant with the offenses. *See Castillo*, 221 S.W.3d at 691.

Furthermore, contrary to appellant's contention, the non-accomplice evidence along with the other detailed evidence supports his convictions as a party. Although neither appellant nor Jones testified, the evidence shows appellant and his brother were known for setting up drug deals. According to J.P., when he contacted Jones about the drugs, he said appellant had them or could get them. Jones also told J.P. big money was going to come because "we got a great gameplan." Appellant, Jones, Beasley and J.P. were in contact with each other throughout the afternoon. Jones led the buyers to believe there would be two kilos of cocaine for purchase that afternoon and that his brother would be at the location with the drugs. Jones repeatedly asked J.P. about the money; J.P. confirmed the deal was for $53,000, and he had seen the money. Jones sent the buyers to the 307 Annarose location where appellant had dropped off Beasley with instructions to "play [the] out-of-town people" from Oklahoma. Appellant supplied Beasley with a gun and told him if anything went wrong to "pop 'em." When Jones told appellant that Beasley was not to mess with J.P., appellant asked what J.P. was wearing that day, and in turn, told Beasley that J.P. was not to be harmed because he was "a partner." After the shooting, Beasley searched the Range Rover for the money, leaving his fingerprints on the backseat door. When appellant picked him up after the shooting and asked about the money, Beasley told him

he could not find it. Appellant said he had to have the money but then left the area when Beasley told him to do so. Police later found the blood-soaked money under Morris's body. This evidence is sufficient to show appellant was criminally responsible for the aggravated robberies of Cherry and Morris or Tharp. Appellant's actions show he directed, aided, or attempted to aid Beasley and Jones in the commission of the offenses and the jury could rely on those actions to infer an understanding and common design to commit the aggravated robberies of Cherry and of Morris or Tharp. After reviewing all the evidence, we conclude any rational trier of fact could have found the appellant guilty as a party beyond a reasonable doubt of both aggravated robberies. We overrule appellant's first and second issues.

**VOIR DIRE**

In his third issue, appellant claims the trial court erred by limiting his time to conduct voir dire "in violation of his constitutional right to the effective assistance of counsel."

We first note that, to the extent appellant claims he was denied effective assistance of counsel at trial, he has not made any effort in his appellate brief to show how trial counsel's performance fell below an objective standard of reasonableness or that a reasonable probability exists that, but for trial counsel errors, the result would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687−88 (1084); *Andrews v. State*, 159 S.W.3d 98, 101−02 (Tex. Crim. App. 2005). Thus, any claim of ineffective assistance of trial counsel fails. *See* TEX. R. APP. PROC. 38.1(i) (brief must contain clear and concise argument for contentions made with appropriate citations to authorities and record); *see also Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) (allegations of ineffective assistance of counsel must be "firmly founded in the record" and failure to make required showing defeats ineffectiveness claim).

To the extent appellant claims trial error requiring reversal, a trial court has broad discretion over the voir dire process, including setting reasonable limits and determining the

propriety of a particular question. *Samaripas v. State*, 454 S.W.3d 1, 5 (Tex. Crim. App. 2014). A defendant's right to question jurors in order to intelligently and effectively exercise peremptory challenges and challenges for cause must be harmonized with the right of the trial court to impose reasonable restrictions on the exercise of voir dire examination. *McCarter v. State*, 837 S.W.2d 117, 119–20 (Tex. Crim. App. 1992). When a defendant complains of an inability to question the venire collectively, we apply a two-prong test: (1) whether the defendant attempted to prolong the voir dire by asking questions that were irrelevant, immaterial, or unnecessarily repetitious and (2) whether the questions the defendant was not permitted to ask were proper voir dire questions. *Id*. at 120 (citing *De La Rosa v. State*, 414 S.W.2d 668, 671 (Tex. Crim. App. 1967)). When a defendant's voir dire is terminated as he attempts to question venire members individually, we must also consider a third factor, known as the *Ratliff* factor: whether the party was prevented from examining a prospective juror who actually served on the jury. *Id*.; *see Ratliff v. State*, 690 S.W.2d 597, 600 (Tex. Crim. App. 1985). Here, appellant was given one hour to conduct voir dire and his questioning ended when his time expired.

Voir dire began on October 7, 2013. The record reflects each venire member completed a questionnaire.[1] After verifying the venire members were qualified to serve, the trial court conducted its own voir dire of the panel. The court's remarks and questions fill almost twenty-five pages in the record and address, among other things, the court's responsibility to tell jurors what the law is, the presumption of innocence, the charges against appellant and his codefendant, the State's burden of proof, what is and what is not evidence, the punishment ranges for the charged offenses and factors that may be considered in assessing punishment, and an understanding of bias. Throughout the court's remarks, it stressed that for the system to work, jurors must be fair to both sides and follow the law as the court gives it to them. The trial court

---

[1] Appellant did not designate the questionnaires be part of the appellate record.

then gave the State ninety minutes and appellant and his codefendant each one hour to question the jury panel. When appellant, who was the last to conduct voir dire, finished, he objected, complaining that the time allotted prevented him from questioning the venire panel about accomplice witness testimony, lesser included offenses, and party liability. Appellant also argued he was unable to ask about each venire panel member's personal beliefs, health issues, connections to law enforcement, as well as whether they (1) had been victims of crime or testified in any case, (2) tended to believe police officers, or (3) would require a defendant to testify or call witnesses. The trial court overruled appellant's objections. Because over two-thirds of the venire were struck for cause, additional venire members were called the following day, and voir dire continued. The same time limits were imposed and, after appellant finished his questioning, he again objected on the same grounds. Certain venire members on the second panel were struck for cause, after which each defendant and the State presented their peremptory challenges. The jury was then seated and sworn in.

Assuming the questions appellant sought to ask were proper, we nevertheless conclude the trial court did not abuse its discretion in limiting his voir dire. Appellant claimed he should have been allowed more time to ask about accomplice witness testimony, lesser-included offenses and their punishment ranges, and liability as a party; the record shows the State spent over fifteen pages of voir dire discussing liability as a party, over seven pages on lesser-included offenses, and its final pages on accomplice witness testimony. The record also shows appellant questioned the venire panel on accomplice witness testimony, asking if they would follow the law and require the State to show other evidence to connect him to the offense, "something else that backs up the accomplice testimony." The panel indicated it would require the State to present other evidence. Because appellant sought additional time to ask questions that had already been addressed, we cannot conclude the trial court abused its discretion in limiting

–16–

appellant's voir dire of these issues. *See Boyd v. State*, 811 S.W.2d 105, 116 (Tex. Crim. App. 1991) (trial court may limit duplicative questions to expedite voir dire process).

Appellant also asserts he should have been allowed to ask the venire: their personal beliefs about serving on a jury; whether any had health issues; what organizations they belonged to; whether they had connections to law enforcement; whether any had previously served on a jury, been a witness at a trial, or been a victim of a crime; if they tended to believe police officers; or would require appellant to testify or bring witnesses. Again, many of these issues were raised when the trial court and the State addressed the venire panel. And to the extent they were not, appellant was not limited in the questions he could ask; rather the trial court was merely enforcing a previously established time limit. *See id.* ("Nothing in the record suggests that the trial court abused its discretion in setting time limits and enforcing them against defense counsel"). Appellant had the responsibility to gauge the subject matter at hand, weigh the relative importance of the legal issues sought to be addressed during voir dire examination, and then budget the time allowed by the trial court to cover those issues. *See Splawn v. State*, 949 S.W.2d 867, 872 (Tex. App.—Dallas 1997, no pet.). By engaging in lengthy discussions of some issues at the expense of others, appellant did not appropriately budget his time. *See id.* Under these facts and circumstances, we cannot conclude the trial court abused its discretion by denying appellant additional time. We overrule appellant's third issue.

## ADMISSION OF EVIDENCE

In his fourth and fifth issues, appellant claims the trial court abused its discretion by allowing certain evidence. Under these issues, appellant contends the trial court should not have allowed the State's expert witness Thompson to testify about documents tendered to appellant several days after trial began. Appellant claims the State failed to comply with the trial court's

–17–

discovery order and, as a result, Thompson should not have been able to rely on the documents or testify about them.

When determining whether a trial court erred by admitting evidence, the standard of review is abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Because trial courts are in the best position to decide questions of admissibility, appellate courts uphold a trial court's admissibility decision when that decision is within the zone of reasonable disagreement. *Id.*; *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007).

During the seventh day of trial, appellant's counsel requested a hearing outside the jury's presence to challenge the admission of certain documents, specifically "a list of cell towers and sites where these cell towers are thoughout [sic] Dallas," received that day. Counsel argued the State had failed to provide the large stack of documents before trial as ordered by the trial court and should not be allowed to introduce them or rely on them for any purpose. In response, the prosecutor argued the cell phone records themselves had been turned over previously and the list at issue contained only the location of cell towers in Dallas, which was public information. The State's expert witness, who had been disclosed, was expected to interpret the phone records and give the general locations where the calls or texts had been made. According to the prosecutor, the expert would testify based on his independent knowledge but might refer to the list to confirm the location of a particular cell tower. The State did not intend to introduce the documents. Counsel argued that because they had not been given time to go through the stack, they would be unable to verify whether the expert's testimony about location was accurate. When the trial court asked how much time they needed to review the documents, counsel responded "At least 45 minutes." The trial court overruled appellant's objection but gave defense counsel an hour and forty-five minutes to review the documents.

Assuming the State failed to comply with the trial court's discovery order, the appropriate remedy was to request a continuance. *Duff–Smith v. State*, 685 S.W.2d 26, 33 (Tex. Crim. App. 1985). Here, counsel did not move for a continuance but asked for and was given time to review the documents. After the break, appellant reurged his objection to the documents as untimely but did not request additional time or argue that the time he had been given was inadequate to review the documents. Appellant did not allege misconduct on the part of the State, and the record does not reflect the prosecutor willfully withheld the evidence. Under these circumstances, we cannot conclude appellant was harmed when the trial court overruled his objections and allowed the expert to rely on the documents. We overrule appellant's fourth and fifth issues.

### MOTION TO QUASH THE INDICTMENT

In his final issue, appellant claims the trial court erred by denying his motion to quash because the allegation of "property" was insufficient to give him notice of an element of the charged offense.

When reviewing a trial court's decision to deny a motion to quash an indictment, we apply a de novo standard of review. *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007); *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004). A motion to quash should be granted only where the language concerning the defendant's conduct is so vague or indefinite as to deny the defendant effective notice of the acts he allegedly committed. *DeVaughn v. State*, 749 S.W.2d 62, 67 (Tex. Crim. App. 1988); *State v. Seibert*, 156 S.W.3d 32, 35 (Tex. App.—Dallas 2004, no pet.).

Here, the indictment charged that appellant did

> then and there intentionally and knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, cause bodily injury to another, TRISTAN CHERRY, hereinafter called complainant, by SHOOTING COMPLAINANT WITH A FIREARM, and the defendant used and exhibited a deadly weapon, to-wit: A FIREARM.

–19–

Appellant claims the trial court erred because he was entitled to a specific allegation of what property he allegedly stole or attempted to steal. We disagree.

Robbery is no longer a form of theft; rather, it is a form of assault. *Ex parte Hawkins*, 6 S.W.3d 554, 560 (Tex. Crim. App. 1999). As a result, "the actual commission of the offense of theft is not a prerequisite to commission of a robbery" and the taking of property is no longer an essential element of the offense. *Earl v. State*, 514 S.W.2d 273, 274 (Tex. Crim. App. 1974) (although the proof will involve establishing a theft or attempted theft, the elements of the particular theft or attempted theft need not be alleged in the indictment). Since particular elements of theft need not be alleged in an aggravated robbery indictment, the trial court could not have erred by failing to require the State to specifically define the term "property." We overrule appellant's final issue.

We affirm the trial court's judgments.

/Ada Brown/
_____
ADA BROWN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

131553F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

JOHN MICHAEL JONES, Appellant

No. 05-13-01553-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 3, Dallas County, Texas
Trial Court Cause No. F12-62863-J.
Opinion delivered by Justice Brown, Justices
Bridges and Fillmore participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 10th day of August, 2015.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOHN MICHAEL JONES, Appellant

No. 05-13-01554-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 3, Dallas County, Texas
Trial Court Cause No. F13-00350-J.
Opinion delivered by Justice Brown, Justices Bridges and Fillmore participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 10th day of August, 2015.